Scott E. Ortiz, WSB No. 5-2550
Erica R. Day, WSB No. 7-5261
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400 (82601)
P.O. Box 10700
Casper, WY 82602
Telephone: (307) 265-0700
Facsimile:  (307) 266-2306
Email:   sortiz@wpdn.net
         eday@wpdn.net

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| ROY RYAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 20-CV-98-J |
| | ) | |
| CORIZON HEALTH, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### CORIZON HEALTH, INC.'S DAUBERT MOTION TO STRIKE PORTIONS OF THE TESTIMONY OF ALFRED JOSHUA, M.D.

**COMES NOW**, Defendant Corizon Health, Inc. (hereinafter "Corizon"), by and through its undersigned counsel, Scott E. Ortiz and Erica R. Day of Williams, Porter, Day & Neville, P.C., and pursuant to FED. R. EVID. 702, respectfully submits this *Daubert* motion to strike portions of the testimony of Alfred Joshua, M.D.  In support of its motion, Corizon states as follows:

### I.   INTRODUCTION.

This case arises from a dispute regarding the medical care provided to Plaintiff Roy Ryan (hereinafter "Plaintiff"), while incarcerated at the Wyoming State Penitentiary.  Plaintiff has asserted claims against Corizon for medical malpractice and deliberate indifference in regards to the care provided for his hip, groin, and lower back pain.  In support of his claim that Corizon was deliberately indifferent, Plaintiff seeks to rely upon the expert testimony of Alfred Joshua, M.D.

(hereinafter "Dr. Joshua"), an Emergency Medicine provider. Dr. Joshua opines that Plaintiff should have been seen by an outside specialist earlier, and that the time that lapsed between when Plaintiff first complained of hip, groin, and testicle pain, to when he eventually underwent a spinal fusion, creates the 'appearance' of a systemic delay in providing a diagnosis and off-site care in order to avoid incurring costs for off-site specialty care.

However, Dr. Joshua acknowledges that he is not a neurosurgeon or orthopedic surgeon, nor does he have any training in those specialties which would qualify him to opine as to what a neurosurgeon or orthopedic surgeon would have recommended after examining Plaintiff. Even more significantly, Dr. Joshua admits that when he opined that Corizon's treatment of Plaintiff was cost-motivated, he did not even know whether Corizon was responsible for the off-site costs at-issue. Indeed, the only support for his claim that Plaintiff's treatment was cost-motivated is based on the 'appearance' of delay.

The Court should preclude Dr. Joshua from testifying that Corizon was allegedly improperly motivated by cost, as his opinion is not grounded in any facts or data, nor is it helpful to the jury. Dr. Joshua should further be precluded from testifying regarding what treatment a neurosurgeon or orthopedic surgeon would have offered Plaintiff, as Dr. Joshua acknowledges he is not qualified to opine on the appropriate specialty treatment of spinal issues.

## II.    STATEMENT OF FACTS.

Dr. Joshua is a board certified Emergency Medicine medical doctor and has been retained as Plaintiff's expert witness. *See* ECF 27. Dr. Joshua has five years of experience in correctional medicine, mostly working at an administrative level. *See* Transcript of the Deposition of Alfred Joshua, M.D., p.13:10-23, attached as "Exhibit A." Dr. Joshua currently spends 40 hours a week in an administrative position overseeing other providers in a non-correctional setting, and 8-10

hours a week in a clinical practice providing emergency care to patients. *Id.* at p.7:13-14:7. Dr. Joshua has no specific orthopedic training other than working in the emergency room and "providing the initial stabilization care such as splinting, if I need to do casting or that type of care." Ex. A, p. 36:22-37:3. Further, he has no training with orthopedic pelvis-type injuries, other than putting in a dislocated hip. *Id.* at p. 37:4-10. He has never administered an epidural injection for lumbar spine treatment. *Id.* at 37:22-25.

Dr. Joshua acknowledges he is not qualified to opine regarding the standard of care for an orthopedic surgeon, or to discuss the treatment options and time frames that would be provided by an orthopedic surgeon or neurosurgeon:

> Q: Doctor, would you agree with me that you would not be able to set the standard of care for an orthopedic surgeon?
>
> A: That is correct.
>
> Q: And you agree that, in the context of appropriate treatment for a spinal problem, an orthopedic surgeon would be much more qualified than you to talk about appropriate treatment options and time frames; agree?
>
> A: I - - I would agree with that. But, again, I think that is what my issue is, that he needed to be seen by an orthopedic surgeon in a more timely manner rather than a year from when the complaint started.
>
> Q: Do you agree that an orthopedic spine surgeon would be better qualified than you to opine when an MRI would be necessary in addition to plain x-rays?
>
> A: Again, if he sees the individual, in a timely manner from when he has a complaint, yes, I definitely agree. But if there is any delay in the orthopedic surgeon evaluating the patient, then imaging studies need to be done to make sure to see what the pathology is.

Ex. A, pp. 39:14-40:10. Dr. Joshua also acknowledges that a neurosurgeon or orthopedic surgeon would be needed to determine whether epidural injections for Plaintiff were appropriate. *Id.* at p. 59:6-10; 68:20-69:4; 90:24 – 91:2.

In Dr. Joshua's written report, he identifies all the materials that he was provided to review prior to issuing his written report.  ECF 27, pp. 9-15.  He does not identify any of the Corizon CARES/UM referral documents, the contract between Corizon and the Wyoming Department of Correction, any Wyoming Department of Corrections' policies regarding the provision of medical care at the Wyoming State Penitentiary, medical bills, or cost summaries regarding the treatment at-issue as having been a part of his review.  *Id*. at p. 5.

Dr. Joshua's written report also sets forth a summary of what he believes are the significant dates at-issue in regards to Plaintiff's medical care.  ECF 27, pp. 9-15.  His notation of significant dates reflects that an MRI of Plaintiff's lumbar spine occurred on October 10, 2018, but then does not show *any* other treatment afterwards until an appointment with Dr. Susanne Levene, a Corizon provider, on July 18, 2019.  *Id*.  This analysis ignores the appointment that occurred in December of 2018 with Dr. Beer, a neurosurgeon with Wyoming Spine & Neurosurgery, as well as several other appointments and communications with Dr. Levene regarding a pain management regime.  *See* Wyoming Spine & Neuro. Record, attached as "Exhibit B"; *see also* January 9, 2019 Encounter, attached as "Exhibit C."

Because of this error, Dr. Joshua repeatedly opines that "[e]ven when the orthopedic surgeon states that it was a spinal issue, his care was not elevated to a spinal surgeon until 18 months later." ECF 27, p. 14.  In reality, it was less than ten months between appointments with Dr. Levene, orthopedic surgeon, and Dr. Beer, neurosurgery.  *See* Premier Bone and Joint Record, attached as "Exhibit D"; *see also* Ex. B.  This error also leads him to conclude that "[i]t appears that only when Mr. Ryan asked his attorney to intervene that the prison started the process of providing him access to a specialist who finally diagnosed the clinical issue." *Id*. at p. 14.  However, the Notice of Claim filed by Plaintiff's attorney, and relied upon by Dr. Joshua in his

review, is dated July 12, 2019 - more than 8 months after Plaintiff had already been seen by a neurosurgeon. *See* Notice of Claim, attached as "Exhibit E."

Dr. Joshua describes the "crux of [his] opinions" as "the escalation of what diagnostics should be, what is the escalation of who the specialists should be." Ex. A, at p. 56:8-11. Essentially, he believes Plaintiff "should have had an expedited visit to see the spine surgeon …to, again, see if, again, there's other treatment options like the epidural shot or something else was going to go on." *Id.* at 71:9-13. However, Dr. Joshua acknowledges that a spine surgeon, not an emergency care provider like himself, is better qualified to opine on what treatment an orthopedic surgeon or neurosurgeon would have recommended. *Id*. at pp. 39:14-40:10.

Dr. Joshua's written report concludes that "[t]he clinical system at the prison was built on delaying a diagnosis that could lead to costly procedures." ECF 27, p. 14. Although Dr. Joshua's written report contains no factual support for this opinion, in his deposition he explains that his opinion as to Corizon's improper motivation is based on the 'appearance' of delay.

> Q:    And certainly no indication in any of the records you've – you've reviewed that cost was a factor in denying treatment; agree?
>
> A:    Again, the appear - - it goes back to the appearance based on the time delay that it looks like the way the system is set up is to try and minimize cost…

Ex. A, p. 106:10-16. Moreover, Dr. Joshua acknowledges that he reached the opinion that Corizon intentionally delayed diagnosis and off-site care to avoid incurring costs, when he didn't even know whether Corizon was responsible for the cost of the off-site care at-issue. *Id*. at 26:6-11. Dr. Joshua also didn't analyze the cost of the treatment provided to Plaintiff, or whether some of the recommendations followed by Corizon were more costly than others which were denied. *Id*. at 105:9-14. Further, his list of reviewed documents does not reflect that Dr. Joshua reviewed the documentation from the Corizon UM/CARES program or the InterQual criteria explaining why

requested imaging or specialty appointments were determined not to be medically necessary at the time. ECF 27, p. 13. He was not even aware of the qualifications of the reviewers, or whether a system such as InterQual was being utilized. Ex. A, p. 22:25 – 23:15

### III.   LEGAL STANDARD.

Pursuant to FED. R. EVID. 702, an expert may testify to their "scientific, technical, or other specialized knowledge," if such testimony will assist the trial of facts. However, Rule 702 further requires the testimony be based on "sufficient facts or data," and be "the product of reliable principles and methods." The gatekeeping obligation established by Rule 702 requires the court ensure "all expert testimony, whether scientific, technical, or any other specialized knowledge, is both reliable and relevant." *Silverthorn v. Killpack Trucking, Inc.*, 2020 WL 8515055, at *2 (D. Wyo. July 22, 2020). This necessitates the Court undertake a two pronged analysis whereby the court must first assess the expert's qualification, including their skill, experience, training or education, and then review the relevance and reliability of the expressed opinions. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-33 (10th Cir. 2004); *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). Finally, the court must determine whether the proposed testimony will assist the trier of fact. FED. R. EVID. 702.

The proponent of the expert testimony at issue bears the burden of proving the foundational requirements of Rule 702 are satisfied by a preponderance of the evidence. *Daubert*, 509 U.S. at 592; *see also Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 141 (1999).

### IV.   ARGUMENT.

**A. DR. JOSHUA'S OPINION THAT CARE WAS DELAYED BASED ON COST IS ENTIRELY UNSUPPORTED BY FACTS OR DATA.**

In assessing an expert's methodology and resources pursuant to Rule 702, "a court is to find an expert opinion reliable under Rule 702 if the opinion is based on 'good grounds.'"

*Silverthorn*, 2020 WL 8515055, at *2-3 (*quoting In re Paoli R.R. Yard PCB Litg.*, 35 F.3d 717, 743 (3d Cir. 1994)). To determine whether 'good grounds' exist, the court should consider whether an expert's opinions are connected to and supported by existing data. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, "expert opinions must provide the underlying facts and basis of the expert's opinions. 'Opinions are valueless as evidence without exploration of the underlying facts and rationale showing the path from the facts to the opinion.'" *Addleman v. Keller Transp., Inc.*, 2014 WL 10222534, at * 4 (D. Wyo. Dec. 9, 2014) (*quoting U.S. v. R.J. Reynolds Tobacco Co.*, 416 F. Supp. 316, 325 (D.N.J. 1976)). Importantly, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. (*citing Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir.), cert denied, 506 U.S. 826 (1992)). Further, "conclusory statements [offered] without the underlying factual support," are "not reliable as they lack the explanatory and necessary building blocks in support of [an expert's] conclusions." *Silverthorn*, 2020 WL 8515055, at *4 (*citing Ge. Elec. Co.*, 522 U.S. at 146)).

Finally, expert testimony must also assist the "trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. In analyzing whether expert testimony meets this requirement, "district courts consider several factors, including whether the testimony is within the juror's common knowledge and experience, and whether it will usurp the juror's role of evaluating a witness's credibility." *U.S. v. Garcia*, 635 F.3d 472, 476-77 (10th Cir. 2011).

Here, Dr. Joshua's opinion that the medical treatment provided by Corizon was motivated by cost is not based on any specialized skill, experience, or knowledge. Further, it is not grounded in any facts or data, but merely conclusory. In *Silverthorn. v. Killpack Trucking, Inc*., this Court

examined a similar opinion by a trucking expert which boiled down to "the accident occurred, therefore [the defendant] violated these rules or regulations." 2020 WL 8515055, at *4. This Court determined that such a conclusory opinion, unsupported by facts or data, did not satisfy the requirements of Rule 702. Similarly, the United States District Court for the District of Colorado recently determined that proposed expert testimony as to a defendant's motivations should be excluded as lacking foundation as "[n]othing in the record reflects that [the expert] has knowledge of the motivations or basis of [defendant's] actions other than as revealed in the claims file." *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 927 (D. Colo. 2017).

To the extent Plaintiff argues Dr. Joshua's opinion is supported by the 'timeline' of treatment, such an argument must also fail. Dr. Joshua's 'timeline' deliberately omits the Plaintiff's December 2018 appointment with a neurosurgeon because it does not fit with his allegations that Corizon waited until Plaintiff engaged legal counsel to provide off-site specialty care. ECF 27, p. 14; Ex. B, C, D. Thus, Dr. Joshua's opinion regarding the treatment timeline is fatally flawed because it is based on incorrect data as there is no dispute that Plaintiff saw a neurosurgeon within two months of his MRI, not the ten months alleged by Dr. Joshua. Ex. A, p. 61:4-16.

Finally, Dr. Joshua's opinion that the amount of time between when Plaintiff's symptoms commenced in his hip and groin to when he underwent a spinal fusion creates the 'appearance' of a delay in diagnosis and treatment to save on costs, does not aid the jury in its fact-finding obligation. Indeed, examining the total amount of time between onset of hip and groin pain and the final surgery is an exercise that can easily be performed by the jury and assessed according to the jury's common knowledge and experience because such an opinion is not based on any specialized knowledge or experience.

Dr. Joshua should be precluded from testifying at trial that the amount of time between Plaintiff's first complaint of hip and groin pain and the date of his spinal fusion creates the appearance that Corizon intentionally delayed or denied diagnoses or treatment in order to save on the costs of off-site specialty treatment, as the opinion is entirely conclusory, devoid of any underlying factual support, and is not based on specialized knowledge which would assist the jury.

### B. DR. JOSHUA IS NOT QUALIFIED TO OPINE REGARDING WHETHER A SPINAL SURGEON WOULD HAVE RECOMMENDED DIFFERENT CARE.

It is well-settled that an expert may testify at trial "so long as the witness' overall qualifications provide expertise relevant to the opinions offered." *Silverthorn*, 2020 WL 8515055, at *2. The expert must establish that they "possess such skill, experience, or knowledge so that the opinion rests on a substantial foundation that will aid the trier of fact in his search for truth." *Lifewise Master Funding v. Telebank*, 374 F.2d 1399, 1408 (10th Cir. 1990). The Tenth Circuit has previously stated that "merely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). In *Alexander v. Smith & Nephew*, 98 F. Supp. 2d 1310, 1315 (N.D. Okl. 2000), the United States District Court for the District of Kansas determined that an emergency room physician was not qualified under Rule 702 to testify to "the medical causation of spine-related ailments," because "[a] blanket qualification for all physicians to testify as to anything medically-related would contravene the Court's gate-keeping responsibilities." 98 F. Supp. 2d 1310, 1315 (N.D. Okl. 2000).

Here, Plaintiff acknowledges that a neurosurgeon or orthopedic surgeon is better suited to opine on lumbar spine issues and their appropriate treatment, and states that the "crux" of his opinion is that Plaintiff should have been sent off-site to a spinal surgeon earlier than August of 2019. Ex. A, at p. 56:8-11. Even if Dr. Joshua is qualified to testify that Plaintiff should have

seen a neurosurgeon or orthopedic surgeon earlier than August of 2019, and ignoring that Plaintiff saw a neurosurgeon in December of 2018, it is necessary to clarify that Dr. Joshua is not qualified to opine on the treatment that would have been offered by a neurosurgeon or orthopedic surgeon. Ex. A, pp. 39:14-44:10.  Dr. Joshua's experience in dealing with orthopedic issues is limited to "providing the initial stabilization care such as splinting," and putting in a dislocated hip. *Id*. at p. 36:22-37:3; 37:4-10; 37:22-25.  He has not established any experience or qualifications that would permit him to opine as to what type of care an orthopedic or neurosurgeon would prescribe for Plaintiff based on his symptoms, imaging, and diagnoses or whether the treatment recommended by Plaintiff's treating neurosurgeon and orthopedic surgeon was appropriate.

Dr. Joshua should be limited to testifying to his opinion that Plaintiff should have been referred out to an orthopedic surgeon or neurosurgeon before August of 2019, but precluded from testifying as to what care may have been or should have been offered to him by such specialists, as he is not qualified by education, experience, or knowledge to testify regarding specialty orthopedic and neurosurgical diagnoses and treatment.

*Remainder of Page Intentionally Left Blank*

## V. CONCLUSION.

**WHEREFORE**, Defendant Corizon Health, Inc. respectfully requests the Court preclude Dr. Joshua from testifying that the Plaintiff's diagnosis and treatment was delayed to save on costs for off-site care, and to the treatment an orthopedic or neurosurgeon would have recommended.

**DATED** this 16th day of April, 2021.

**CORIZON HEALTH, INC.**

 /s/ Erica R. Day
Scott E. Ortiz, WSB No. 5-2550
Erica R. Day, WSB No. 7-5261
WILLIAMS, PORTER, DAY & NEVILLE, P.C.
159 North Wolcott, Suite 400 (82601)
P.O. Box 10700
Casper, WY 82602
307-265-0700 telephone
307-266-2306 facsimile
sortiz@wpdn.net
eday@wpdn.net