—1—

```
1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF WYOMING
2
   ROY RYAN,                    )
3                               )
        Plaintiff,              )
4                               )
   v.                           )   Civil No. 20-CV-98-J
5                               )
   CORIZON HEALTH, INC., and    )
6  its employees and agents,    )
                                )
7        Defendant.             )   CERTIFIED COPY
   ------------------------------------------------
8
9       REMOTE DEPOSITION OF ALFRED JOSHUA, MD
              Taken by the Defendant
10           Friday, February 5, 2021
                   9:02 a.m.
11
12        PURSUANT TO NOTICE, the remote deposition of
13  ALFRED JOSHUA, MD, was taken via Zoom video conference
14  in accordance with the applicable Wyoming Rules of
15  Civil Procedure.  Dr. Joshua and Mr. Bailey appeared
16  via Zoom.  Mr. Ortiz, Ms. Day, and the reporter were
17  at the offices of Williams, Porter, Day & Neville,
18  P.C., 159 North Wolcott Street, Suite 400, Casper,
19  Wyoming.  Proceedings reported by Susan Edwards, RPR,
20  CSR, and a Notary Public in and for the State of
21  Wyoming.
22
23
24
25
```

SUSAN EDWARDS, RPR, CSR
Susan.EdwardsCSR@gmail.com

EXHIBIT
A

ALFRED JOSHUA, MD - 02/05/2021

                                                                    -2-

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF:

3            MR. HENRY F. BAILEY, JR.
             ATTORNEY AT LAW
4            BAILEY STOCK HARMON COTTAM LOPEZ, LLP
             6234 Yellowstone Road
5            Cheyenne, Wyoming 82009

6    FOR THE DEFENDANT:

7            MR. SCOTT E. ORTIZ
             MS. ERICA R. DAY
8            ATTORNEYS AT LAW
             WILLIAMS, PORTER, DAY & NEVILLE, P.C.
9            159 North Wolcott, Suite 400
             Casper, Wyoming 82601

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALFRED JOSHUA, MD - 02/05/2021

7

1      A.  I do not have it at those hospitals, but I do

2  clinically practice at the VA hospital in San Diego,

3  and I practice every week there.

4      Q.  So the hospitals you described, Alvarado and

5  what was the other one?

6      A.  Paradise Valley Hospital.

7      Q.  Paradise Valley Hospital.  So for instance,

8  you do not actually treat patients at those hospitals;

9  correct?

10      A.  I do not treat patients at those hospitals.

11      Q.  And do not have admitting privileges there?

12      A.  No.

13      Q.  How much of your time in a given week is

14  spent in that role as regional medical director over

15  those facilities?

16      A.  40 -- about 40 hours, 30 or 40 hours.

17      Q.  Okay.  And how much time do you spend in a

18  given week at the VA hospital?

19      A.  8 to 12 hours.

20      Q.  And are you working at the VA hospital in

21  their emergency department or in --

22      A.  Yes.

23      Q.  -- another role?

24      A.  So I'm a board certified emergency room

25  physician, and I work in their emergency department

ALFRED JOSHUA, MD - 02/05/2021

8

1    purely as a clinical practice.

2        Q.   All right.  8 to 12 hours, do you take

3    basically one shift per week?

4        A.   Yes.

5        Q.   Every -- and is that every week?

6        A.   Pretty much every week and then some holidays

7    as well.

8        Q.   Okay.  So if you work in the emergency

9    department at the VA only, do you have actual admitting

10   privileges at the VA?

11       A.   Yes, I do.

12       Q.   What else are you privileged for by way of

13   procedures or interventions at the VA, if anything?

14       A.   So I am able to do every procedure an

15   emergency room physician could do.  I can intubate

16   patients.  I can put in chest tubes.  In a worst-case

17   scenario, I can -- have to do a thoracotomy and open up

18   the chest, I'll have to open up the chest.

19           I can do I -- incision and drainage for

20   abscesses.  I can do thoracentesis, basically

21   paracentesis.

22           And then, again, in emergency situations, if

23   I need to put a burr hole in, if I need to do a lateral

24   canthotomy, saphenous vein cutdown, I can do all those

25   procedures as well.

9

1      Q.   Are the only people eligible to go to the

2   emergency room at that VA veterans?

3      A.   Veterans are the ones that are covered by

4   insurance, but we do get humanitarians, people that

5   walk in or come in, drive in.  So we are obligated to

6   treat them.  They just get a bill, I guess, for the

7   treatment.

8      Q.   And how long have you been in that role in

9   the emergency room at the VA hospital?

10      A.   So I've been there since 2015, so almost

11   six years.  Prior to that, I worked at a community

12   hospital at the Tri-City emergency department, and

13   prior to that, clinically, I was also at UCSD in their

14   emergency departments for both hospitals.  And that's

15   in my clinical practice.

16         And then from an administrative practice,

17   prior to coming to Prime Healthcare, I was close to

18   five years at the San Diego Sheriff's Department as the

19   chief medical officer from 2013 to 2018, where I

20   oversaw pretty much all of the jails in

21   San Diego County.

22      Q.   And I'm going to -- we'll talk some more

23   about that, Doctor.  I think what I'll do for ease of

24   tracking and a chronology, I'm going to go back and

25   just kind of walk you through your medical education.

ALFRED JOSHUA, MD - 02/05/2021

—10—

1          You got your actual medical degree at the

2    University of California at San Diego; is that correct?

3          A.   No.  My medical degree is from New York.  So

4    it's from SUNY Upstate in Syracuse.

5          Q.   Okay.  And then you did your first residency

6    program in San Diego; is that correct?

7          A.   Yes.  My residency program was a four-year

8    residency program, the first year at Scripps Mercy as

9    an internship year and then three years after that at

10   UCSD for emergency medicine.

11         Q.   And so what -- by the time you finished your

12   residency program at UCSD, what year was that?

13         A.   2011.

14         Q.   Okay.  So in 2017, am I correct that you

15   decided to go back to college and get an administration

16   degree?

17         A.   So I ended up doing a fellowship.  So I did a

18   two-year fellowship at UCSD as a hospital

19   administrative fellowship working under the CEO and the

20   CMO of the UCSD hospital as well as at the same time, I

21   did get a Health Care Executive MBA at UC Irvine.

22         Q.   So give me the time frame.  Had you completed

23   your residency program before you took on these

24   administrative --

25         A.   Yes, I did.

ALFRED JOSHUA, MD - 02/05/2021

—11—

1    Q.   -- education --

2    A.   So from 2011 to 2013, I did my fellowship and

3    got my MBA.

4    Q.   And in those years, did you have any clinical

5    practice?

6    A.   Yes, I did.  I worked, actually, at both

7    Tri-City and at UCSD in the emergency department.

8         So what I would do is, during the day, I

9    would be doing my administrative fellowship, and then

10   in the evenings and even some overnights, I'd be

11   working in the emergency department for my clinical

12   practice as well as to pay my bills.

13   Q.   Did there come a time, Doctor, that your

14   interests went away from direct patient care and you

15   decided you wanted to get into administration?

16   A.   Actually, I always had a love to do both, and

17   that's why I actually pushed myself to -- regardless of

18   how many hours a week, that I always have clinical

19   practice every single week.

20        So I wanted to have a balance of the both,

21   but the administrative is more the majority of my time.

22   Q.   So you have -- and after you got your

23   residency program, you got board certified in emergency

24   medicine?

25   A.   Yes.

ALFRED JOSHUA, MD - 02/05/2021

-12-

1       Q.   What year was that?

2       A.   2012.

3       Q.   And so that's good and through 2022?

4       A.   Yes.

5       Q.   So do you plan on retaking the boards?

6       A.   Yes.  I'm actually in the process of doing

7  that.

8       Q.   Okay.  Have you ever worked as a hospitalist,

9  Doctor?

10      A.   No.

11      Q.   Have you ever worked with chronic care

12  patients?

13      A.   Yes, I have.

14      Q.   In what context?

15      A.   So there was a period -- and I also oversaw

16  the chronic care programs at San Diego County as part

17  of the San Diego County Sheriff's Department.  I did

18  work clinically as a jail sick-call physician at the

19  San Diego jails prior to me being the chief medical

20  officer.

21         So in that role, I directly did some of the

22  chronic care as well as, when I was the chief medical

23  officer, designed some of the programs and then,

24  obviously, interacting with the providers on what

25  needed to be done.

ALFRED JOSHUA, MD - 02/05/2021

-13-

1      Q.   So let me understand this, Doctor.   Through

2    2013, you're getting an MBA and a hospital

3    administration degree while pulling some shifts in the

4    ER at San Diego hospital; is that correct?

5      A.   From 2011 to 2013.   So 2013 I finished up,

6    yes.

7      Q.   All right.   From 2013 when you have those

8    administrative degrees, it's my understanding you go to

9    work for San Diego County; is that correct?

10     A.   I was hired to be their chief medical officer

11    in November of 2013, so a couple of months after I

12    finished getting the MBA and after I finished the

13    fellowship.

14     Q.   All right.   So when you start working for

15    San Diego County as the medical director, can we agree

16    that is primarily an administrative job?

17     A.   That is correct.

18     Q.   And I take it probably extensive hours with

19    that job every week, overseeing those different jails

20    and providers?

21     A.   That is correct.

22     Q.   And that was the job you basically had for

23    five years?

24     A.   Yes.

25     Q.   How many different jails did you have some

ALFRED JOSHUA, MD - 02/05/2021

14

1    type of administrative oversight over?

2        A.    Seven.

3        Q.    How many different providers did you monitor

4    to some extent?

5        A.    So there were a number of contracted

6    providers.  I think we had at the time 19 different

7    contracts.

8              So we had sick -- medical doctors that came

9    in for regular, everyday sick call for eight hours.  We

10   had dentists.  We had mental health providers,

11   psychiatrists.

12             And then we had about, I think, 307 nurses

13   that included both RNs and LVNs, and then, obviously,

14   mental health clinicians and other administrative

15   folks.

16       Q.    Where was your home base?  Where was your

17   office?

18       A.    It was located in San Diego, in Kearny Mesa,

19   part of San Diego.  There was a county operations

20   building.

21       Q.    So I'm assuming you were part of where maybe

22   the county coroner's office would be, maybe part of the

23   sheriff's department that type of thing?

24       A.    Yep, right across from the coroner's office.

25       Q.    And there was not a jail right there adjacent

ALFRED JOSHUA, MD - 02/05/2021

-22-

1  actually had an InterQual system where we would

2  basically see if InterQual -- if it agreed with the

3  guidelines.

4        And then myself, I would basically then

5  oversee the last phase of it if there needs to be any

6  other questions of whether it needed to be reviewed.

7        Q.   So did you have the final say as to what

8  outside services could be provided to an inmate?

9        A.   I -- in select cases.  Most of the time, if

10 it was, again, approved at the lower levels, I didn't

11 need to be involved.  But if there was a question,

12 definitely, I would be the final authority.

13       Q.   And were there times that you thought that

14 requested services were not warranted and you did not

15 authorize outside testing or specialty services?

16       A.   There might have been.  The good example is

17 if somebody was waiting to go to prison and we felt

18 they were going to go within a month, I would actually

19 call up the prison and just say, "We can either start

20 this here, but I know you guys have different

21 providers.  Do you want to start it there?"

22       So that's typically where some of the

23 deferrals would happen, depending on what their

24 disposition was.

25       Q.   Is the InterQual system that was used in

ALFRED JOSHUA, MD - 02/05/2021

23

1    San Diego something you implemented?

2        A.   Yes.

3        Q.   Is that the same system utilized by the

4    Wyoming Department of Corrections and

5    Corizon Healthcare in Rawlins, Wyoming?

6        A.   I do not know.

7        Q.   Have you looked into that in any context for

8    your opinions in this case?

9        A.   So I know that you guys have a CARES -- there

10   was a committee and all.  I didn't know if they, if the

11   committee was just a group of individuals giving expert

12   opinion or if they were utilizing InterQual or

13   McMillan's (phonetic) guidelines for any input because

14   I didn't see any documentation straight -- related to

15   InterQual.

16       Q.   Did -- when you would authorize or one of the

17   providers at San Diego County would authorize someone

18   to go off-site, for instance, to get an MRI, when the

19   hospital billed that back to the county, was it paid at

20   the standard charge rate that the hospital charges?

21       A.   So, again, before I got on there, there was a

22   contract with UCSD.  It was actually a percentage of

23   billed charges.

24       Q.   What was the percentage?

25       A.   I think it was in the 50s or 60 percent.

ALFRED JOSHUA, MD - 02/05/2021

-26-

1    Q.   Okay.  You asked for it and were not provided

2    it; is that right?

3    A.   I -- I remember talking about it.  I don't

4    know -- I went through my records, but I don't believe

5    I've seen the actual contract.

6    Q.   Okay.  So as you sit here today and for

7    purposes of the opinions you've rendered in this case,

8    you don't know whether Corizon pays for the off-site

9    care, whether the State of Wyoming does, or whether

10   it's a mixture; correct?

11   A.   At this point, no.

12   Q.   Would that be important to know, Doctor, in

13   the context of rendering opinions about reasonable --

14   or excuse me -- deliberate indifference in the context

15   of care for inmates?

16   A.   Well, in this situation, my issue was that,

17   from the time of the complaint to when he had -- ends

18   up getting the intervention, 33 months has passed.  So

19   usually, from a reasonable time period is what most of

20   my opinions was based on.

21        So he comes off as the appearance of that

22   there is a systematic effort to delay the care because,

23   at every stage of the way, more and more months are

24   being tacked on even when there's an erroneous

25   complaint where, initially, it's thought to be hip

ALFRED JOSHUA, MD - 02/05/2021

—36—

1    was a number of them that dropped off based on the

2    lawyer dropping off the case, and then there were ones

3    that motion for summary judgment.

4              And then the numbers of that even then went

5    to -- then it would go to settlement, but it would take

6    years.  And there's ones that haven't settled at all

7    so -- or are awaiting trial.  So but I think only from

8    my time maybe two or three that I've heard that was

9    just settled.

10        Q.   At any time when you were working at the

11   county, did the ACLU or any other entity move for an

12   injunction against some aspect of your medical services

13   for the inmates?

14        A.   So I believe the ACLU was a -- was -- they

15   came in and stated stuff, but I think there was a

16   number of other plaintiff groups that also -- plaintiff

17   attorneys that also came to San Diego from time to time

18   as well.

19        Q.   Were you under one or more consent decrees

20   issued by the court from 2013 through 2018?

21        A.   We were never under a consent decree.

22        Q.   Let me change gears with you a little bit,

23   Doctor.  Do you have any specialized orthopedic spine

24   training?

25        A.   No.  Other than my working in the emergency

ALFRED JOSHUA, MD - 02/05/2021

—37—

1   department and providing the initial stabilization care

2   such as splinting, if I need to do casting or that type

3   of care, but not specific for orthopedic surgery.

4        Q.   Okay.  So would the same be true for

5   orthopedic pelvis-type injuries?

6        A.   Yeah.  Again, if a hip is dislocated, I can

7   put the hip back, which I've done many times if it's a

8   posterior hip dislocation and then, obviously, checking

9   the X-rays, making sure.  But then I would consult with

10  the orthopedic doc for the follow-up care.

11       Q.   Do you read your own X-rays, Doctor?

12       A.   I typically do, yes.  But I -- also there

13  are -- I do get the official reports as well, but many

14  times for chest X-rays and fracture X-rays, I'll read

15  it myself and do the intervention.

16       Q.   You don't read your own CTs, do you?

17       A.   I've tried to read the CTs, but again, I will

18  always call up the radiologist just to confirm.

19       Q.   Are you qualified to read an MRI?

20       A.   MRI is one I definitely let the radiologist

21  do.

22       Q.   Do you ever been in the context of providing

23  epidural injection for lumbar spine treatment?

24       A.   I have not personally administered an

25  epidural shot, no.

ALFRED JOSHUA, MD - 02/05/2021

39

1   for exhausting conservative treatment options before

2   you consider surgical intervention if you believe you

3   have that type of hip -- hip impingement?

4        A.   I would say typically, for many of these

5   types of things, it's six weeks to three months, and

6   then you would obviously see if their -- if the

7   intervention is working.

8             If it's not, then obviously, you try physical

9   therapy, but there is a graduated period of time.

10  Again, I don't believe it's years.  I believe, again,

11  it's six weeks to about three months, and then you see

12  what is working and then go on to the next graduated

13  response for treatment.

14       Q.   Doctor, would you agree with me that you

15  would not be able to set the standard of care for an

16  orthopedic surgeon?

17       A.   That is correct.

18       Q.   And you agree that, in the context of

19  appropriate treatment for a spinal problem, an

20  orthopedic spine surgeon would be much more qualified

21  than you to talk about appropriate treatment options

22  and time frames; agree?

23       A.   I -- I would agree with that.  But, again, I

24  think that is what my issue is, that he needed to be

25  seen by an orthopedic surgeon in a more timely manner

ALFRED JOSHUA, MD - 02/05/2021

-40-

1   rather than a year from when the complaint started.

2       Q.   Do you agree that an orthopedic spine surgeon

3   would be better qualified than you to opine when an MRI

4   would be necessary in addition to plain X-rays?

5       A.   Again, if he sees the individual in a timely

6   manner from when he has a complaint, yes, I definitely

7   agree.  But if there is any delay in the orthopedic

8   surgeon evaluating the patient, then imaging studies

9   need to be done to make sure to see what the pathology

10  is.

11      Q.   Doctor, have you ever worked in the context

12  of private health care when you, as an ordering

13  physician, had to fight with either a managed care

14  group or an insurance company as to what procedures or

15  testing they would authorize and pay for?

16      A.   Not in my -- not in my clinical practice.  In

17  the emergency department, I can order stuff without

18  having to deal with the insurance company.

19      Q.   Okay.  Did you -- after you completed your

20  residency program, Doctor, have you ever received any

21  other specialized medical training that we have not

22  talked about?

23      A.   No.  Pretty much I think everything is in the

24  CV.

25      Q.   Do you have continuing medical education

ALFRED JOSHUA, MD - 02/05/2021

—41—

1   requirements in California?

2       A.   Yes.

3       Q.   What are the requirements per year?

4       A.   I believe it's about 50 CMEs per year.

5       Q.   And how do you typically stay current with

6   your CMEs?

7       A.   Typically, through up to date, and then

8   sometimes I'll take classes.  So last year, I ended up

9   getting my license for Suboxone.  So that was eight

10  hours in and of itself.  And through some of

11  correctional -- correctional programs, they'll give me

12  CMEs as well.

13      Q.   Do you keep a list of your CMEs that you've

14  attended in any given year?

15      A.   For the purposes of when I have to do the

16  certification, I will resubmit it, but I don't keep a

17  list until I need to.

18      Q.   Of the CMEs that you obtain, how many are

19  geared toward emergency medicine, what percentage

20  typically in a year?

21      A.   Probably about half to a little bit more than

22  half.

23      Q.   What would the other ones be geared toward?

24      A.   Correctional health.

25      Q.   Doctor, within the field of correctional

ALFRED JOSHUA, MD - 02/05/2021

—42—

1   medicine, do you have specialized interests within that

2   field?

3        A.   Can you please repeat it?  Sorry.

4        Q.   Sure.  Within the field of correctional

5   medicine, do you have subspecialty interests within

6   that field?

7        A.   No.

8             (Exhibit 1 was marked for identification and

9             is attached hereto.)

10  BY MR. ORTIZ:

11       Q.   From -- and I want to -- Doctor, your report

12  that also includes your background and education and

13  training, I've marked for purposes of the deposition as

14  Exhibit 1.

15       A.   Yes.

16       Q.   So I'm going to refer to that and I -- I have

17  some questions for you in regard to some of your

18  presentations and publications.  It looks like you have

19  researched or written quite a bit on jail suicide.

20            Do I interpret that correctly, Doctor?

21       A.   It's not -- I don't believe it's written.

22  These were oral presentations.  The publications are, I

23  believe, all the stuff that was written.

24       Q.   Okay.

25       A.   So I think the other stuff are all

ALFRED JOSHUA, MD - 02/05/2021

43

1    presentations where I presented to an audience or gave

2    a lecture or even at some of them with NCCHC, where I

3    would do it with a room of a hundred people.

4         Q.   So my question's a little bit narrower.

5              Do you have -- have you written or lectured

6    extensively on jail suicide issues?

7         A.   I have lectured, yes.

8         Q.   Okay.  Is that a big part of the focus of

9    correctional medicine, from your view, to prevent jail

10   suicide?

11        A.   So, again, I think it's a part because anyone

12   who comes in to a correctional facility is at elevated

13   risk for suicide.  So I think it's an area that gets a

14   lot of focus.  And, again, I have spoken about that,

15   but I have also spoken about many other things in the

16   jail as well.

17        Q.   Is there anywhere within a presentation or

18   publication on your Exhibit 1 that you would have

19   talked about chronic orthopedic care?

20        A.   Chronic orthopedic care.  So on -- not

21   specific for orthopedic care, no.

22        Q.   Say that again, Doctor?

23        A.   Not specific for orthopedic care.

24        Q.   Okay.  I notice that you are referenced in

25   some publications.  Did you publish or contribute to

ALFRED JOSHUA, MD - 02/05/2021

44

1   any written publications after you left your residency

2   program?

3        A.   After the residency program?  Yes.  So I

4   think Number 4 and Number 5 in my publication list are

5   after the residency.

6             One was in 2016, where we actually were one

7   of the first law enforcement in the country to have our

8   officers to have naloxone to prevent opiate overdose in

9   the community.  And so the officers would administer

10  it, and that was actually under my license for all the

11  officers.  So we were really happy about that.

12            And then there was the one in 2016 as well

13  for PPD, that the chest X-ray was more for admitted

14  inmates.  That was better than using the regular PPD

15  with the skin test.

16       Q.   Thank you for clarifying that for me.

17            And naloxone also goes by the trade name of

18  Narcan; is that right?

19       A.   That is correct.

20       Q.   A great way to reverse opioid overdose?

21       A.   Yes.

22       Q.   I noticed, Doctor, that you referenced

23  contributing to Rosen and Barkin's *5-Minute Medicine*

24  book?

25       A.   Yes.

ALFRED JOSHUA, MD - 02/05/2021

—56—

1          Again, my issue is when the pain doesn't get

2     better, what is that appropriate time line?

3          And then the question is we all have, you

4     know, clinical red herrings, and what happens when you

5     look at the totality of this case is that those X-ray

6     findings are a red herring to what the actual issue

7     was.

8          So if something is not getting better, what

9     is the escalation of what the diagnostics should be,

10    what is the escalation of who the specialist should be,

11    and that is really the crux of my opinions in the case.

12         So, again, I have no issues with what the

13    radiologist is stating, what the treatment providers

14    were doing, but at what point does it have to be

15    escalated?  And I feel, again, the time frame is too

16    long.

17       MR. ORTIZ:  Just for the record, I'm going to go

18    ahead and move to strike that answer as not

19    nonresponsive.

20    BY MR. ORTIZ:

21       Q.   Doctor, it will be a lot easier if you answer

22    my specific question.  I ask pretty straightforward

23    simple questions.  My question has nothing to do with

24    your overall opinions.  My question is very simple.

25         Based on his complaints, based on the

ALFRED JOSHUA, MD - 02/05/2021

59

1    be thinking about getting someone surgery in their

2    pelvis, you would want to exhaust your conservative

3    options, given that dramatic step of getting an

4    orthopedic surgery.  Can we agree?

5        A.   Again, my escalation there is to see an

6    actual orthopedic specialist.  So my -- my thing here

7    would be what would be the next step which would be do

8    you do shots straight into the joint space, which we

9    would probably need to see an orthopedic specialist to

10   evaluate if that's the next treatment option.

11       Q.   You have an understanding that there was an

12   intervention where Kenalog shots were provided into

13   Mr. Ryan's hip area?

14       A.   Yes.

15       Q.   Did -- do you believe those were appropriate?

16       A.   Again, when we realize a year later, when he

17   sees an orthopedic specialist, that the issue has

18   nothing to do with the hip and it's the spine, again,

19   my issue is because he needed to see the orthopedic

20   specialist in a more consolidated manner.

21            I'm not stating, you know, in March that he

22   needs to have surgery, but he needs, if he's not

23   getting better, to see the specialist because of

24   exactly this issue where one year goes by and everybody

25   thinks it's the hip when it's the spine.

ALFRED JOSHUA, MD - 02/05/2021

1    InterQual and then, again, the third step.  So it

2    depends where -- what the complaint is and what the --

3    and what is being requested.

4         Q.   And you agree with me, in the context of

5    trying to provide services for an inmate population,

6    these things take time even -- even with the best

7    intentions; agree?

8         A.   Yes.

9         Q.   It's kind of like, if I want to go see an

10   orthopedic spine neurologist or neurosurgeon right now,

11   I can't get in tomorrow or the next day typically, can

12   I?

13        A.   No.

14        Q.   It might be a month wait before I can even

15   get in to see someone?

16        A.   That is correct.

17        Q.   I assume that's the same phenomena in private

18   health care in San Diego?

19        A.   That is correct.  Usually, if it's a

20   non-emergent complaint where you don't go to emergency

21   department to get expedited stuff, that it could be

22   four to six weeks.

23        Q.   And inmates and providers in prisons kind of

24   have the same issue just with different steps they have

25   to go through to get things approved; agree?

ALFRED JOSHUA, MD - 02/05/2021

68

1   would have different conservative treatments.

2        Q.   Well, do you have an understanding that some

3   point in time after Dr. Levene's findings, he's sent

4   outside to a physical therapist for specific lumbar

5   physical therapy stretching to help with that?

6        A.   You mean in 2018?

7        Q.   Yes.

8        A.   Yes, I am aware, yes.

9        Q.   And that's a -- that's an appropriate

10  treatment modality, is it not?

11       A.   Oh, again, I have no disagreements with that.

12            The question was, again, in 2017 he goes

13  almost a year and over a year without those treatments

14  for the condition.  So, again, it's time lag.

15       Q.   So I just want to make sure I understand

16  that.  So your criticism is you think they treated the

17  hip for too long a period of time in 2017 before he was

18  seen by Dr. Levene?

19       A.   That is correct.

20       Q.   All right.  Then after he's seen by

21  Dr. Levene and we make an assumption we are likely

22  dealing with a lumbar problem, you agree that it was

23  reasonable to try other treatment modalities before we

24  jump to MRI and surgery.  Do you agree with that?

25       A.   So, again, that's where you would start the

ALFRED JOSHUA, MD - 02/05/2021

69

1    treatment with the physical therapy right away with the

2    treatment, but again, that is where I also felt he

3    needed to see the spine surgeon to see if the epidural

4    injection would alleviate his symptoms.

5        Q.   So, Doctor, I'm looking -- I'm looking at

6    your time line on your Summary of Document Review.

7        A.   Yeah.

8        Q.   And I just want to make sure I understand

9    your -- your interpretation of the records.

10           Do you interpret that, sometime around as

11   early as June, there was discussion about whether we

12   should get an MRI?

13       A.   Yes.

14       Q.   And then that actually went through multiple

15   levels of this approval process that we've described?

16       A.   Yes.  And my -- again, my issue is, after

17   he's seen by Dr. Levene and it's basically stating that

18   there's a spinal evaluation needs to be done, he needs

19   to then see a spinal surgeon even if that comes before

20   the imaging, to see if, again, a treatment plan like an

21   epidural shot was an option to help with the pain and

22   suffering at that point.

23       Q.   Do you have an understanding, Doctor, one way

24   or another, whether there's controversy about using

25   epidural shots for lumbar degenerative changes?

ALFRED JOSHUA, MD - 02/05/2021

—71—

1    frame.

2            Because just because the case was mis-dia --

3    I don't want to say miss -- well, misdiagnosed or that

4    the red herring of the radiologist went down a

5    different path, I think you still take into account the

6    full year that he was having the symptoms that was

7    misin- -- appropriated to the hip, and that's where I

8    still feel very strongly that, after the February

9    appointment with Dr. Levene, that he should have had an

10   expedited visit to see the spine surgeon within a month

11   or two after that to, again, see if, again, there's

12   other treatment options like the epidural shot or

13   something else was going to go on.

14       Q.   Doctor, you keep calling the radiologist's

15   report referencing this impingement syndrome a red

16   herring.  Are you -- is it going to be your testimony

17   in this case it was unreasonable for the healthcare

18   providers from Corizon to rely on that radiology

19   report?

20       A.   So again --

21       Q.   And that's -- that's a yes-or-no question,

22   Doctor.  I just want an answer to that question.

23       MR. BAILEY:  No, Scott, he's entitled to answer

24   the question as he sees fit.  I don't think you have to

25   confine him to "yes" or "no" in this deposition.

ALFRED JOSHUA, MD - 02/05/2021

90

1    nerve damage.

2         Q.   Doctor, this same paragraph references --

3         MR. ORTIZ:  Something went --

4         MS. DAY:  Sorry.

5         MR. ORTIZ:  Okay.  That's all right.

6    BY MR. ORTIZ:

7         Q.   -- that:  "He'd been seen by a different

8    provider...who told him he had a pars defects" --

9         A.   Yes.

10        Q.   -- "spondylolisthesis and had recommended

11   some injections."

12             Do you know what specific type of injections

13   would have been utilized with someone with these type

14   of complaints?

15        A.   I believe an epidural shot to that spine

16   area.

17        Q.   Are you qualified to render an opinion as to

18   whether epidural shots in the lumbar area for Mr. Ryan

19   would have had any beneficial effect?

20        A.   Again, I think it's part of the constellation

21   of treatments including nonsteroidals, physical therapy

22   and epidural shots.  So I -- I would present it in that

23   manner.

24             To say the technical aspects of it that an

25   orthopedic surgeon would do, that obviously a

                                                             —91—

1    specialist can say that.  But, again, it is a treatment

2    option that can be explored prior to going to surgery.

3         MR. ORTIZ:  Go ahead and go to the next page,

4    Erica, under Physical Exam.

5    BY MR. ORTIZ:

6         Q.   Do you recall reviewing this Physical Exam on

7    page 2 of Dr. Harris's report?

8         A.   Yes.

9         Q.   Doctor, there are -- there is a reference

10   there that there is some muscle strength change four --

11   four-plus over five on the right.  It looks like that's

12   with his tibialis anterior on the left.

13             Remind me what the -- what is the tibialis

14   anterior muscle?

15        A.   I believe it's -- tibialis anterior, I think,

16   is talking about the nerve there.

17        Q.   Well, it's referencing muscle strength.

18        A.   Tibialis anterior -- you have the hamstrings,

19   the quads.  Tibialis anterior, there's a nerve that

20   runs that -- down that way, tibialis.

21        Q.   So the fact that there's a slight reduction

22   referenced there, is that significant to you?

23        A.   Well, it is significant, but I think it's

24   accounted for because of the MRI report as well as on

25   this thing and what the eventual recommendations are,

ALFRED JOSHUA, MD - 02/05/2021

71

1   frame.

2          Because just because the case was mis-dia --

3   I don't want to say miss -- well, misdiagnosed or that

4   the red herring of the radiologist went down a

5   different path, I think you still take into account the

6   full year that he was having the symptoms that was

7   misin- -- appropriated to the hip, and that's where I

8   still feel very strongly that, after the February

9   appointment with Dr. Levene, that he should have had an

10  expedited visit to see the spine surgeon within a month

11  or two after that to, again, see if, again, there's

12  other treatment options like the epidural shot or

13  something else was going to go on.

14      Q.   Doctor, you keep calling the radiologist's

15  report referencing this impingement syndrome a red

16  herring.   Are you -- is it going to be your testimony

17  in this case it was unreasonable for the healthcare

18  providers from Corizon to rely on that radiology

19  report?

20      A.   So again --

21      Q.   And that's -- that's a yes-or-no question,

22  Doctor.   I just want an answer to that question.

23      MR. BAILEY:   No, Scott, he's entitled to answer

24  the question as he sees fit.   I don't think you have to

25  confine him to "yes" or "no" in this deposition.

ALFRED JOSHUA, MD - 02/05/2021

105

1      Q.   And can we agree you really only saw evidence

2   of that on one occasion?

3      A.   Well, the chronic care visit and the Hutchi-

4   (phonetic) -- yeah, that one occasion as together.

5      Q.   Do you remember what year that was, Doctor?

6      A.   That was 20- -- I would have to look through

7   the records to see exactly what year that was.

8      Q.   Okay.  And that's fine.

9           Did you ever determine the total value of

10   outside services that Mr. Ryan received for his foot,

11   his shoulder, his hip, his back from the whole time

12   continuum from March 2017 through December of 2019?

13      A.   I did not do an analysis or put a value on

14   that.

15      Q.   Okay.  Can we agree Mr. Ryan got significant

16   care, testing, and treatment from outside providers?

17      MR. BAILEY:  Object to the form of the question.

18           Go ahead, Doctor.

19      THE WITNESS:  Again, for the complaints that he

20   had -- again, I think he has diabetes.  He has COPD.

21   He has other medical complaints -- he is seen and has

22   treatments for different conditions that he has that he

23   brought with -- brought into.

24   BY MR. ORTIZ:

25      Q.   And in the context of the hip, slash, back

1   issues, he was seen by three separate -- or two

2   separate -- one orthopedic surgeon, two separate

3   neurosurgeons; is that correct?

4       A.   Yes.

5       Q.   Outside physical therapists?

6       A.   Yes.

7       Q.   And X-rays being interpreted by Cheyenne

8   Radiology Group for numerous ailments?

9       A.   Yes.

10      Q.   And certainly no indication in any of the

11  records you've -- you've reviewed that cost was a

12  factor in denying treatment; agree?

13      A.   Again, the appear -- it goes back to the

14  appearance based on the time delay that it looks like

15  the way the system is set up is to try and minimize the

16  cost, and, I mean, I'll give a good analogy on this.

17           Similar to, as you guys know, like with

18  Game Stop, when the Robinhood traders basically were

19  restricted to buy, it gives the appearance that there

20  is favoritism, where that there is some manipulation,

21  whether that's true or not on a liquidity issue.

22           Similar to this, when you have such a long

23  period of time, HSR requests have to be put in, there's

24  denials on the UM going back and forth.  And even when

25  it was a hip issue that they thought for a year, and